CASE NO. 22-2885

## UNITED STATES COURT OF APPEALS
### FOR THE SEVENTH CIRCUIT

COLE NOLEDNER

      Plaintiff-Appellant,

v.

TAYLOR COUNTY, LARRY WOEBBEKING,
LOGAN SCOLES, AARON BERNAS, and
RHONDA SACKMAN.

      Defendant-Appellees.

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN
CASE NO. 21-CV-244
HON. WILLIAM M. CONLEY

## REPLY BRIEF OF PLAINTIFF-APPELLANT

**CADE LAW GROUP LLC**

Nathaniel Cade, Jr.*
Annalisa Pusick
P.O. Box 170887
Milwaukee, WI 53217
Phone: (414) 255-3802
Fax: (414) 255-3804
nate@cade-law.com
annalisa@cade-law.com

Attorneys for Appellant
*Lead Counsel of Record*

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................... ii

TABLE OF AUTHORITIES ...................................................................iv

ARGUMENT ............................................................................................ 6

**I.   THE DISTRICT COURT IMPROPERLY APPLIED QUALIFIED IMMUNITY TO DISMISS THE CLAIMS AGAINST SCOLES, BERNAS, SACKMAN, AND WOEBBEKING.** ............................................. 6

     A.   The Undisputed Facts of This Case Showed Scoles, Bernas, and Sackman Acted Unreasonably and Therefore Qualified Immunity was Improper. ........................................................................ 6

     B.   The Undisputed Evidence Showed Woebbeking Did Not Adequately Train Jail Employees on Reporting Procedures, Therefore Summary Judgment Was Inappropriate. ......................... 11

**II.  TAYLOR COUNTY HAD NOTICE ITS DEFICIENT TRAINING AND POLICIES RELATED TO REPORTING GUARD-INITIATED SEXUAL ASSAULT WOULD LEAD TO CONSTITUTIONAL VIOLATIONS.** ................................................................................... 13

     A.   Deficient Training and Policies Related to What Qualified as Sexual Assault and How (and When) Corrections Officers Were to Report Suspicions. ..................................................................... 14

         i.   *Taylor County's Policies Caused Noeldner's Constitutional Injury.* ........................................... 17

         ii.   *Taylor County Had Notice That its Policies, or Lack Thereof, Would Cause Constitutional Violations.* ......................................................... 18

     B.   Deficient Training and Policies Related to Jail Staff Regarding Reviewing Inmate Text Messages for Evidence of Sexual Misconduct ...................................................................... 19

         iii.   *Taylor County's Policies Caused Noeldner's Constitutional Injury.* ........................................... 20

     C.   Deficient Training and Policies Related to Intercom and Video Surveillance System .......................................................... 21

**III. THE UNDISPUTED FACTS AND BINDING PRECEDENT CONFIRM THAT CHEEVER'S SEXUAL ASSAULT OF NOELDNER WAS WITHIN THE SCOPE OF CHEEVER'S EMPLOYMENT UNDER WIS. STAT. § 895.46(1)(a).** ........................... 21

A. *Martin* is Factually Different Than Noeldner's Case; Therefore, the County Should Indemnify Cheever's Conduct. ........................... 22

B. Cheever was Motivated by a Personal and Professional Purpose and Therefore Her Conduct was Within the Scope of Employment. ...................................................................................... 24

C. This Court Has An Opportunity to Use Noeldner's Claims as a Vehicle to Establish Precedent on Wisconsin Indemnification Standards. ............................................................................................. 25

**CONCLUSION** .............................................................................................. 28

**CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(A)(7),**
**FRAP RULE 32(G), AND FRAP RULE 32(C)** ....................................... 29

**PROOF OF SERVICE** ................................................................................. 30

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Arias v. Allegretti,*
  No. 05 C 5940, 2008 WL 191185 (N.D. Ill. Jan. 22, 2008) ...................................... 26

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,*
  520 U.S. 397, 117 S. Ct. 1382 (1997) ...................................................................... 17

*Bell v. City of Milwaukee,*
  746 F.2d 1205 (7th Cir. 1984) .................................................................................. 26

*City of Canton v. Harris,*
  489 U.S. 378, 109 S.Ct. 1197 (1989) ................................................................. 16, 19

*District of Columbia v. Wesby,*
  138 S. Ct. 577 (2018) ................................................................................................. 6

*Doe v. Lee,*
  943 F.Supp.2d 870 (N.D.Ill. 2013) ........................................................................... 26

*Doe v. Roe,*
  No. 12 C 9213, 2013 WL 2421771 (N.D. Ill. Jun. 3, 2013) ...................................... 26

*Harlow v. Fitzgerald,*
  457 U.S. 800, 102 S.Ct. 2727 (1982) ......................................................................... 6

*Hope v. Pelzer,*
  536 U.S. 730, 122 S. Ct. 2508 (2002) ........................................................................ 7

*J.K.J. v. Polk County,*
  960 F.3d 367 (7th Cir. 2020) ....................................................................... 15, 18, 19

*Javier v. City of Milwaukee,*
  670 F.3d 823 (7th Cir. 2012) .................................................................................... 22

*Johnson v. Cook County,*
  526 Fed. Appx. 692 (7th Cir. 2013) .......................................................................... 26

*K.R. v. Matthew R. Baumhardt, et al,*
  No. 21-CV-0118, 2022 WL 16958920 (E.D. Wis. July 14, 2022) ............................ 27

*Leiser v. Kloth,*
  933 F.3d 696 (7th Cir. 2019) ...................................................................................... 7

*Lewis v. Richards,*
  107 F.3d 549 (7th Cir. 1997) ...................................................................................... 7

*Martin v. Milwaukee,*
  904 F.3d 544 (7th Cir. 2018) ....................................................................... 22, 24, 26

*Olson v. Connerly,*
  156 Wis. 2d 488, 457 N.W.2d 479 (1990) ..................................................... 21, 24, 26

*Ortiz v. Jordan,*
  562 U.S. 180, 131 S. Ct. 884 (2011) ....................................................................... 6, 9

*Pearson v. Callahan,*
    555 U.S. 223, 129 S.Ct. 808 (2009) ................................................................. 6

*Russ v. Watts,*
    414 F.3d 783 (7th Cir. 2005) ..................................................................... 26

*Williams v. Ortiz,*
    917 F.3d 936 (7th Cir. 2019) ..................................................................... 13

*Windle v. City of Marion, Indiana,*
    321 F.3d 658 (7th Cir. 2003) ..................................................................... 13

*Woodward v. Corr. Med. Servs. of Ill., Inc.,*
    368 F.3d 917 (7th Cir. 2004) ..................................................................... 17

**STATUTES**

Wis. Stat. Ann. § 895.46(1)(a) ............................................................... 21, 26

## ARGUMENT

### I.    THE DISTRICT COURT IMPROPERLY APPLIED QUALIFIED IMMUNITY TO DISMISS THE CLAIMS AGAINST SCOLES, BERNAS, SACKMAN, AND WOEBBEKING.

Qualified immunity does not protect the plainly incompetent. When jail officials' conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known, qualified immunity becomes inapplicable. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982)). A law is clearly established when every reasonable jail official would understand that his or her conduct was unlawful. *District of Columbia v. Wesby*, 138 S. Ct. 577 (2018). Appellees agree that there is no debate that failing to protect an individual in custody from sexual abuse is clearly established. Appellee Br., at 20-21. However, Appellees' contention that no evidence exists to support Noeldner's claims is utterly false. They, like the district court, are viewing the record in the light *least* favorable to Noeldner.

### A.    The Undisputed Facts of This Case Showed Scoles, Bernas, and Sackman Acted Unreasonably and Therefore Qualified Immunity was Improper.

The district court erred in its qualified immunity analysis. Here, the substance of the law is not in controversy. *See Ortiz v. Jordan*, 562 U.S. 180, 190, 131 S. Ct. 884 (2011) (discussing that there is no dispute that clearly established law protects inmates from jail staff who are deliberately indifferent to guard-inmate sexual assault). In contrast, the district court reasoned that the law was not clearly established because the defendants "acted reasonably in the particular

circumstances." App. A., at 021-022 ("no reasonable jury could find on this evidence that these rank and file officers suspected or should have suspected Cheever presented a serious risk of harm to plaintiff at that time."). That is not true. Clearly established law showcases the right to be free from sexual assault in confinement settings. Moreover, courts do not demand, nor is it necessary to provide a case exactly on point to evade qualified immunity. *Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508, 2518 (2002) (holding that when a constitutional violation is obvious, qualified immunity can be denied without a prior case exactly on point). As long as a reasonable officer would have known their conduct was unlawful, qualified immunity is inappropriate. *Leiser v. Kloth*, 933 F.3d 696, 704 (7th Cir. 2019).

The district court's decision sets a scary precedent. Its decision encourages and rewards corrections officers and facilities, like Scoles, Bernas, and Sackman, to stay silent and refuse to report their suspicions in the face of co-employee concerns. The district court improperly concluded that jail officials should not report a "senior officer's" suspicious behavior, even when there is some suspicion that the "senior officer" is violating the law, as well concluding that it was "prudent" that the jail officials "consult[ed] another, objective line officer and d[id] some follow up investigation" before reporting that "senior officer" based on merely suspicion. App. A., at 023. None of that is true and its conclusion is contrary to clearly established law, the Jail's own policies, and the PREA's purposes.

The record illustrates a concerning reality: Scoles, Bernas, and Sackman expressly contradicted themselves in their own declarations. For example, Scoles

stated he was never made aware of any concerns regarding Cheever's behavior or professionalism. R. 53, at ¶ 10. Yet later, Scoles identified, at least three instances where jail staff made Scoles aware of concerns regarding Cheever's behavior and professionalism. *Id.*, at ¶¶ 28, 31, 34, 36, 38, 40. Bernas stated there was no reason to suspect Cheever was behaving improperly. R. 51, at ¶ 32, 37, 49. Yet, Bernas was one of the two correction officers who voiced concerns about Cheever's inappropriate behavior to Scoles. *Id.*, at ¶¶ 33, 45, 47. In fact, Bernas was so suspicious of Cheever's conduct that Bernas confronted Cheever and asked her to perform her job *differently*; "A day or two later, on September 18, 2018, [Bernas] was working third shift at TCJ with Officer Cheever. [Bernas] approached her and told her that [he] noticed Mr. Noeldner calling the control pod more often when she was working."; "[Bernas] told Officer Cheever that it could just be coincidental, but [he] was concerned about the potential for manipulation and for her safety while she was in the medication room." *Id.*, at ¶¶ 52-55. Bernas cannot have it both ways – either he was aware of suspicious behavior requiring him to report or he was blissfully unaware. His declaration speaks for itself.

In addition, Sackman was so "uneasy" about Cheever's conduct that she asked for Scoles' advice *twice*. R. 52, at ¶¶ 37, 48. Sackman observed suspicious "looks" between Cheever and Noeldner and "overly friendly" conversations. R. 52, at ¶¶ 35, 39, 46. Sackman also had such a bad feeling about Cheever and Noeldner that she "could not shake." R. 53, at ¶ 47. A reasonable corrections officer would not have gossiped to coworkers about the drama, she would have reported it to her supervisor

as is required by her training. The district court erred when it failed to consider the vast contradictions among sworn statements when it concluded that Scoles, Bernas, and Sackman acted reasonably. Importantly, Appellees cannot assert that Noeldner has not put forward evidence that, taken in his favor, fail to suggest that each officer had specific knowledge of Cheever's conduct because their own declarations advance Noeldner's claims.

Furthermore, the district court erred because the undisputed facts and reasonable inferences therefrom showed that Scoles, Bernas, and Sackman not only had information worthy of reporting, but acted deliberately indifferent to Cheever's sexual assault of Noeldner. It is clearly established that corrections officers shall not act deliberately indifferent to a known risk of sexual assault. *Ortiz v. Jordan*, 562 U.S. at 190; *but see* App. A., at 023 ("the defendants' actions did not violate clearly established law...") (emphasis in original). Significantly, the district court's decision was based on the reasonableness of Scoles, Bernas, or Sackman's *response*, not their knowledge and physical observations. App. A., at 023. The Jail claimed that Scoles, Bernas, and Sackman were "extensively trained" on detecting and reporting PREA violations. Appellee Br., at 13. But none of them immediately reported their suspicions like their "training" should have taught them. R. 51, at ¶¶ 14-15, 27; R. 52, at ¶ 23; R. 53, at ¶¶ 14-15.

Notwithstanding such training, Scoles, Bernas, and Sackman were never instructed to obtain objective evidence before reporting a fellow guard, such as Cheever; however, Scoles, Bernas, and Sackman "felt like" they needed objective

evidence to report Cheever conduct. *See* R. 51, at ¶¶ 3-5, 10-23; R. 52, at ¶¶ 7-11, 13-23; R. 53, at ¶¶ 5-7, 12-23. The record is clear that the only "evidence" needed was suspicion. R. 54, at ¶ 17. Moreover, Scoles, Sackman, and Bernas were not responsible for investigating employee misconduct and had no business "confirming" their suspicions before reporting it. R. 54, at ¶ 3 (Woebbeking was responsible for investigations). Had the individual officers been responsible for investigating employee concerns, the district court's analysis may have been proper. But the undisputed evidence is clear that the officers were not responsible for investigating employee concerns, and therefore, their response was plainly unreasonable per the Jail's own standards. No "extensively trained," reasonable officer, would have ignored Cheever's suspicious behavior and waited to report it to a supervisor until they had obtained "objective evidence." The only reasonable response was for them to "report immediately" any "information" regarding Cheever's behavior. R. 54, at ¶ 17.

The district court improperly viewed the facts in the light *least* favorable to Noeldner because Scoles, Bernas, and Sackman were aware of and observed concrete suspicions of Cheever's conduct before Cheever sexually assault Noeldner. R. 53, at ¶ 28. Instead of responding reasonably and reporting their suspicions to Jail administration, they idly sat back until it was the harm was already done. A response that effectively ignores the risk of harm is not a reasonable response. *See Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997) (discussing that a response that ignores the risk is not a reasonable response). Moreover, the *only* way Scoles, Bernas, and Sackman's actions could be viewed as reasonable is if they were not adequately

trained on the Jail's sexual assault reporting policies. Yet, they claim the contrary. Therefore, the district court improperly granted summary judgment in favor of Scoles, Bernas, and Sackman. This reviewing Court should reverse the lower court's decision.

> **B.**    **The Undisputed Evidence Showed Woebbeking Did Not Adequately Train Jail Employees on Reporting Procedures, Therefore Summary Judgment Was Inappropriate.**

The Jail cannot claim Scoles, Bernas, and Sackman were adequately trained on reporting procedures when the evidence is painstakingly clear that they failed to follow this so-called training. Only two possibilities exist: either Scoles, Bernas, and Sackman were adequately trained and acted unreasonably, therefore summary judgment was inappropriate; or Woebbeking failed to adequately train Scoles, Bernas, and Sackman, and therefore summary judgment was still inappropriate.

The district court's conclusion that there was "no evidence to support [Noeldner's] assertion that a lack of training or supervision had anything to do with the claims made in this lawsuit" was not supported by the evidence. App. A., at 024. Rather, evidence showed that Woebbeking simply informed his staff on the written policies rather than ensuring such policies were adequately followed in practice. Because the district court failed to consider the utter lack of evidence pertaining to Woebbeking's *actual* training on those policies, this Court should reverse the lower court's ruling.

Scoles, Bernas, and Sackman were not "extensively trained." Woebbeking was responsible for overseeing Scoles, Bernas, and Sackman's training and failed to make

clear reporting guard-initiated sexual abuse was necessary and required. R. 54, at ¶¶ 3, 14, 16-17, 22, 28. Such training was nothing more than being informed of the written policies regarding the Jail's "zero tolerance" policy, verbal warnings prohibiting "fraternization," and to immediately report inmate initiated sexual acts. *Id*. Moreover, Woebbking did not adequately train staff on explaining the Jail's PREA policies to inmates. R. 54, ¶¶ 32-35. Merely handing an inmate the Jail's rules in a dense handbook and posting a "zero-tolerance" posters is not enough.

Woebbeking's inadequate training regarding sexual abuse and reporting suspicions is directly related to Noeldner's claims. Had Scoles, Sackman, and Bernas been adequately trained, they would not have felt the need to obtain "objective evidence" to "confirm their suspicions" before reporting Cheever. R. 53, at ¶ 45. Adequate training would have informed Scoles, Sackman, and Bernas that mere "suspicions" were to be reported "immediately." Appellee Br., at 26. Devastatingly, Sackman and Bernas told Scoles they were suspicious of Cheever's behavior in early September 2018, R. 52, at ¶¶ 37, 48; had they reported it immediately, they could revel as having saved Noeldner from being sexually assaulted by Cheever on September 10, 2018.

Furthermore, the district court erred when it concluded that Noeldner was required to produce evidence such as "retaliation" or "discipline" for reporting suspicions of fellow officers or a "culture" of covering up employee misconduct to show the lack of training "had anything to do with the claims made in this lawsuit." App. A., at 024. Evidence of "retaliation" or "discipline" for reporting suspicions of fellow

officers does not evince inadequate training on reporting suspicions immediately. It is simple: Woebbeking had a reasonable opportunity (and duty) to train jail employees on how and when to report suspicions. R. 54, at ¶ 3; *See Windle v. City of Marion, Indiana*, 321 F.3d 658, 663 (7th Cir. 2003) (liability for failure to train). And if Bernas and Sackman were adequately trained on reporting suspicious conduct, they would have reported Cheever's interactions to a supervisor instead of another colleague.[1] Instead, Scoles, Bernas, and Sackman had no idea what to do with their suspicions. Because of this reality, Cheever's misconduct was left unfettered, and she was able to continue violating Noeldner's constitutional rights all the way up to and including sexual intercourse.

The district court's conclusion showed it did not view the facts in the light most favorable to Noeldner, as it was required to. *See Williams v. Ortiz*, 917 F.3d 936, 941 (7th Cir. 2019). Woebbeking oversaw the Jail and employee training and had a realistic opportunity to properly train his employees. Adequate training would have prevented Cheever from harming Noeldner as Scoles, Bernas, and Sackman were suspicious of Cheever and Noeldner before Cheever sexually assaulted Noeldner. Therefore, qualified immunity was inappropriate, and this court should reverse and remand this case back to the district court for trial.

## II.  TAYLOR COUNTY HAD NOTICE ITS DEFICIENT TRAINING AND POLICIES RELATED TO REPORTING GUARD-INITIATED SEXUAL ASSAULT WOULD LEAD TO CONSTITUTIONAL VIOLATIONS.

---

[1] In fact, Bernas consulted not only one but *two* colleagues. R. 51, at ¶¶ 44, 47.

13

Taylor County deficient training and policies caused Noeldner's injury and it had notice that its policies, or lack thereof, would cause constitutional violations. The evidence of Taylor County's policies and training in the record, along with the sworn statements of Scoles, Bernas, Sackman, Woebbeking, and Noeldner prove that Taylor County's policies and training were entirely inadequate and nothing more than words on paper. Thus, the district court inappropriately granted summary judgment necessitating reversal.

### A.    Deficient Training and Policies Related to What Qualified as Sexual Assault and How (and When) Corrections Officers Were to Report Suspicions.

Taylor County had deficient training and policies related to what defined sexual assault and reporting sexual assault. The Jail's policy prohibited staff from becoming overly familiar with inmates, sexual acts or salacious conversations, and inappropriate notes or letters with inmates. R. 54, at ¶ 26. Appellees stand on their assertions that Cheever was always friendly with inmates and therefore her behavior was part of the status quo. Again, even this assertion violates the Jail's policy to forbid such interactions for the safety of inmate and staff alike. What the policy did not state was the definition of sexual assault or how and when staff were supposed to report sexual contact initiated by a corrections officer. R. 54, at ¶ 26 (discussing that attempts made only <u>by inmates</u> to initiate sexual acts <u>must be reported</u>) (emphasis added)).

As an initial matter, the district court improperly attempted to place blame on Noeldner. App A., at 026. It was not Noeldner's responsibility to protect himself from Cheever. Moreover, Noeldner was not aware of the Jail's rules and policies regarding

reporting sexual assault. R. 67, at ¶¶ 18-23. The Jail merely handed Noeldner the inmate handbook that contained the Jail's PREA policies. R, 54, ¶¶ 32, 35; R. 67, at ¶¶ 18-23. And even if Noeldner was "familiar" with the handbook, that does not prove Taylor County trained, or at the very least, informed Noeldner how he could report sexual abuse or harassment, whether he would get disciplined for it, or what even constitutes sexual assault. *See e.g J.K.J. v. Polk County*, 960 F.3d 367, 374 (7th Cir. 2020) (affirming jury verdict of *Monell* liability for inadequate training when the only training inmates received was a printed copy of the inmate handbook). The policy does not state how or when inmates could report guard-initiated sexual abuse. *See* R. 54, at ¶ 35.

Noeldner's awareness of the policy is not relevant to whether the County had adequate policies and training for its correction officers regarding how and when *they* (i.e., corrections officers) were to report suspicions of guard initiated sexual abuse or harassment. The undisputed evidence showed, when viewed in the light most favorable to Noeldner, that the Jail's policies existed only in writing. In fact, the only reporting policy on point required staff to report inmate initiated sexual acts. There was no policy or training on how to report known or suspicions of sexual harassment or abuse initiated by a guard. R. 51, at ¶ 27 (discussing "training" on the reporting policy regarding "all attempts <u>by inmates</u> to initiate sexual acts"); R. 52, at ¶ 23 (discussing "training" on the reporting policy for when <u>inmates</u> attempt to initiate sexual acts); R. 53 (containing <u>no evidence</u> of being trained on reporting any kind of sexual misconduct); R. 67, at ¶ 24; R. 54, at ¶ 17 (containing no evidence of reporting

policies for guard initiated sexual abuse). There was no policy or training regarding guard initiated sexual abuse. *See e.g.* R. 53, at ¶ 45 (discussing that Scoles "felt" like objective evidence would make the situation "reportable."); R. 52, at ¶ 23; R. 51, at ¶ 27.

Nothing in the record details Scoles, Bernas, and Sackman's so-called "extensive training" on how to prevent, detect, and report sexual misconduct at the Jail. In fact, Scoles was never trained on reporting procedures for guard initiated sexual assault. *See* R. 53 (noting that the only discussion related to reporting is ¶ 28 where Scoles advised Sackman to report it if Sackman "felt it was warranted" ¶ 33.). At best, the evidence shows that the Jail's correctional officers were informed of the Jail's PREA policies during their "new officer training" and that is it. That is hardly considered "training."

And despite Appellees attacking Noeldner's "hands-off" distinction, the Supreme Court has comfortably applied alternative paths to determine municipal liability. This includes *City of Canton v. Harris* where the Supreme Court observed that there may be circumstances in which "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights" that a factfinder could find deliberate indifference to the need for training. 489 U.S. 378, 390, 109 S.Ct. 1197 (1989). "In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Id*. Stated differently, a risk of constitutional violations can be so demanding and the need for

training so obvious that the municipality's failure to act can reflect deliberate indifference, allowing an inference of institutional blameworthiness, even without earlier known violations. Consequently, even "a single violation of federal rights can trigger municipal liability if the violation was a 'highly predictable consequence of the municipality's failure to act.'" *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 406, 117 S. Ct. 1382 (1997)).

Regardless, the district court incorrectly concluded that a mere written policy paired with verbal instructions at "new officer training" was enough to warrant dismissal of Noeldner's claims. Thus, summary judgment was inappropriate and should be reversed.

### i. Taylor County's Policies Caused Noeldner's Constitutional Injury.

The district court erred because Noeldner would not have been injured had the Jail's corrections officers been trained under a program that was not deficient. Policies do not exist without training; training brings policies to life. Had the Jail adequately trained its corrections officers and inmates on what "sexual activity or contacts" meant, Noeldner would not have been sexually abused. In addition, if the Jail had adequately trained its staff on how to report suspicions to jail administration, Scoles, Bernas, and Sackman would have "immediately" reported their suspicions and Noeldner would not have been sexually abused.

When the Jail's only rule regarding reporting sexual acts has to do with <u>inmate-initiated</u> sexual acts, it is no wonder why Scoles, Bernas, and Sackman acted

so unreasonably to Cheever's conduct and why Noeldner himself did not have to tools to report it. Had there been policies and training that was sufficient, Noeldner would not have been sexually assaulted because either the officers or Noeldner would have been put on notice that Cheever's behavior was intolerable and in direct conflict with hard and fast Jail policies. Instead, the officers and Noeldner were left without direction. Therefore, the deficient policies and training caused Noeldner's constitutional injures, and the County failed to address how its policies were truly sufficient.

### ii. Taylor County Had Notice That its Policies, or Lack Thereof, Would Cause Constitutional Violations.

The district court incorrectly determined that Noeldner was required to prove notice via a pattern of past similar violations. App. A., at 027-028. All that was required was evidence of "a known or obvious" risk that its policies would lead to similar constitutional violations. *J.K.J.*, 960 F.3d at 381. Here, it is obvious that material gaps in written policies and deficient training on sexual assault in prisons would lead constitutional violations. *Id.* ("The jury knew that [there was a risk] from common sense—the reality was as obvious as obvious could be...".). Moreover, the confinement setting topped with power dynamics between guards and inmates exemplify how obvious the risk of sexual abuse is if there is not adequate training and policies in place. *Id.* at 384. This concept is neither new nor novel.

What is *not* on paper is more important than the fact that an underutilized policy exists on paper. In essence, the Jail's training on preventing, detecting, and reporting sexual misconduct in the Jail was all but nonexistent. The policies merely

stated the obvious, "zero tolerance" for sexual assault. R. 54, at ¶¶ 17, 26, 32. The gap widened with the utter failure to train its corrections officers on what "zero tolerance," "sexual assault," and reporting suspicions looked like in real life. Correctional officers were almost exclusively verbally informed of the Jail's policies that prohibited sexual contact with inmates at their "newly hired training." R. 54, at ¶¶ 18-20. Nothing in the record supports whether Scoles, Bernas, and Sackman received any training on reporting suspicions or guard-initiated sexual abuse. *See e.g.*, R. 51, at ¶ 27; R. 52, at ¶ 23. In fact, Cheever trained Bernas and Sackman. R. 52, at ¶ 6; R. 51, at ¶ 7. The most training Bernas and Sackman received from Cheever was a "warn[ing] against fraternization with inmates." R. 52, ¶ 9. Nothing in the record showed any training, in any meaningful shape or form, regarding sexual assault, how to report sexual assault, or when to report sexual assault was conducted. The Jail's lack of training on sexual abuse and reporting policies, in light of the obvious risk, illustrates deliberate indifference. *See J.K.J.,* 960 F.3d at 384-85.

Because the risk was obvious, Taylor County had notice that its lack of policies and training would likely to result in a violation of constitutional rights. *City of Canton*, 489 U.S. at 390. Therefore, the district court improperly granted summary judgment, as a jury could conclude that Taylor County's policies and training was entirely lacking.

> **B.    Deficient Training and Policies Related to Jail Staff Regarding Reviewing Inmate Text Messages for Evidence of Sexual Misconduct.**

Regardless of whether the district court's decision required Noeldner to identify specific text messages or if it "simply pointed out that Noeldner had failed to

identify" specific text messages, Appellee Br. at 30.; the district court still reached an incorrect conclusion. As discussed at length in Noeldner's principal brief, there is significant support in the record that Jail staff had been previously alerted to potential photos Noeldner wished to send to a female friend and felt compelled to address the text messages to ensure the safety and security of the Jail. R 65, at ¶ 40. Obviously, Jail staff's concern about sexually explicit photos being disseminated was enough to trigger review. Therefore, scanning the messages between Cheever and Noeldner certainly raise a higher level of concern as to the safety of inmates and Jail staff. The district court and Appellees miss the mark in not recognizing the serious misstep in failing to properly monitor inmate text messages. In turn, this oversight is directly linked to Noeldner's constitutional deprivation, and the Jail has admitted to a prior security risk worthy of investigating. R 65, at ¶ 40.

### i.   Taylor County's Policies Caused Noeldner's Constitutional Injury.

The fact that Cheever took numerous steps to conceal her text messages with Noeldner and got away with it highlights a significant gap in the text message policy. The evidence showed that Noeldner did in fact provide the court with specific texts. Noeldner identified specific text messages "that should have alerted jail officials that Officer Cheever or some other jail officer was sending the messages." App A., at 027. In addition, the identified text messages reasonably contain information that "could jeopardize the safety and security of the jail." R. 67, at ¶¶ 42-44. Had there been any training to inmates or guards on what would adequately "jeopardize the safety and security of the jail," Cheever and Noeldner's text messages containing discussions of

role playing, taking off Cheever's guard uniform, and Noeldner's positions inside the jail would have been flagged. That would have stopped Cheever and Noeldner from texting, ultimately preventing their relationship from progressing, and Cheever would not have sexually assault Noeldner. Thus, the County's policies caused Noeldner's injury. Additionally, like the sexual abuse policies above, (*supra* Sec. II.A.ii.); there was an obvious risk that the Jail's text message policy would lead to constitutional violations.

### C.     Deficient Training and Policies Related to Intercom and Video Surveillance System.

Neither the district court's decision nor Appellees' response brief rebuts Noeldner's arguments on appeal regarding Taylor County's deficient training and policies related to its intercom and video surveillance system. *See* App. A, at 025-028; Def-App. Br., at 27-33. Appellees' entire *Monell* argument rests on dodging the facts highlighted by Noeldner which are obvious from the record. As such, Noeldner stands on his arguments stated in his brief in chief.

## III.   THE UNDISPUTED FACTS AND BINDING PRECEDENT CONFIRM THAT CHEEVER'S SEXUAL ASSAULT OF NOELDNER WAS WITHIN THE SCOPE OF CHEEVER'S EMPLOYMENT UNDER WIS. STAT. § 895.46(1)(a).

The district court and Appellees' interpretation of Wisconsin's indemnification statute directly conflicts with binding Wisconsin precedent. Wisconsin requires an indemnification analysis to consider whether the employee was "actuated," in *some* measure, by a purpose to serve the employer. *Olson v. Connerly*, 156 Wis. 2d 488, 457 N.W.2d 479 (1990). In addition, it does not always matter if an employee's misconduct was outside her "authorized" employment duties; an employee can misuse or exceed

her authority while still acting within the scope of her employment. *Javier v. City of Milwaukee*, 670 F.3d 823, 830 (7th Cir. 2012). In cases that involve inmate sexual assault by corrections officer, binding precedent is clear: the misconduct could be within the scope of employment because it has never been exclusively ruled out. *Martin v. Milwaukee*, 904 F.3d 544, 556-57 (7th Cir. 2018) ("We do not hold sexual assault *could never* be within the scope.")(emphasis added).

The "scope of employment" question is a "fact issue" reserved for the jury and should be returned for a jury. *Martin*, 904 F.3d at 554. When the undisputed facts and all reasonable inferences drawn therefrom led to two conflicting conclusions, the question must be sent to the jury. *See Id*.

### A. *Martin* is Factually Different Than Noeldner's Case; Therefore, the County Should Indemnify Cheever's Conduct.

The facts in *Martin* are distinguishable from this present case. Cheever's conduct was a natural part of, or incidental to, the services she was employed to perform. In *Martin*, the guard's sexual assaults were not natural, ordinary, connected to, or incidental to, a part of the services the guard was employed to provide because at least three of the four sexual assaults occurred from made-up attorney-client meetings and infirmary visits. 904 F.3d at 548-549. There, two of the sexual assaults arose out of the guard bringing the inmate to a cell for an attorney-client visit. *Id*., at 548. Both of those attorney-client visits were made up and not legitimate. *Id*. In the third instance, the guard brought the inmate to a medical cell for a doctor appointment and sexually assaulted her. *Id*., at 549. The medical appointment also was made up. *Id*. There was no question in *Martin* that the guard acted outside the

scope of employment because the sexual assaults occurred from the guard's own made-up "appointments" to get the inmate alone. Here, Cheever did not make up "appointments" to get Noeldner alone. R. 44, at ¶¶ 22-23. Noeldner requested and did receive medication, so therefore Cheever performed the services she was employed to perform by bringing Noeldner medication, and sexually assaulted Noeldner while performing those services on behalf of the Jail. R. 44, at ¶¶ 22-23, 39; R. 67, at ¶ 45. And as discussed above, Bernas was aware of the medication visits and how often Noeldner was calling when Cheever was on duty. R. 51, at ¶¶ 52-55.

The sexual assault was natural, ordinary, connected to, or incidental to, a part of the services Cheever was employed to perform for the Jail and summary judgment was inappropriately granted despite this truth. Some of the natural services Cheever's was employed to perform included giving inmates' medication from the medication room, speaking to inmates via the intercom system, and conducting walk throughs. R. 44, at ¶¶ 18-23. Through the natural part of the services Cheever was employed to perform, i.e., getting inmates medication from the medication room, scanning the hallways, exchanging conversations with inmates via the intercom system, and evading detection of cameras and other staff. R. 44, at ¶¶ 22-23, 39. Cheever did not bring Noeldner to the medication room for the sole purpose of sexually assaulting Noeldner. R. 44, at ¶¶ 22-23. Cheever would bring Noeldner into the medication room to give him medication, like she was employed and authorized to do. *Id*. Thus, the sexual assault was natural, ordinary, connected to, or at least incidental to, the services Cheever was employed to perform.

23

### B.    Cheever was Motivated by a Personal and Professional Purpose and Therefore Her Conduct was Within the Scope of Employment.

Cheever was motivated by both her employer's purpose and a personal purpose when she sexually assaulted Noeldner. *Martin*, 904 F.3d at 553 ("Serving the employer *need not be the employee's only or primary purpose* for the conduct to be in the scope") (citing *Olson*, 457 N.W.2d at 483))(emphasis added). Cheever's conduct was actuated, in some manner, by a purpose to serve the Jail. R. 44, at ¶¶ 18-21. She had unfettered access to the medication room based on her job responsibilities. Just because Cheever sexually assaulted Noeldner on one occasion does not push her conduct outside the scope of those same employment duties. *Id*. Cheever used the medication room with Noeldner to further both personal *and* employment purposes. Moreover, the manner Cheever used the medication room (bringing an inmate inside the room) was not entirely improper. R. 44, at ¶¶ 23, 43. Cheever also was known to be compassionate, a good listener, and a model guard. R. 52, at ¶¶ 11-12; R. 53, at ¶¶ 9-10; R. 51, at ¶¶ 12-13, 26, 37-40. Cheever treated Noeldner like any other inmate she supervised (until she began priming Noeldner for sexual abused), which further showed that Cheever's conduct fell within the scope of her employment.

The only question that mattered was whether Cheever was acting for her own purposes or as a correctional officer when she sexually assaulted Noeldner. *See Martin*, 904 at 556 ("an employee's being "at least partially actuated by a purpose to serve the employer" is a *sine qua non* of scope.") (citing *Olson*, 457 N.W.2d at 483). Reasonable minds differ, and when there are two conflicting conclusions drawn from the undisputed facts and reasonable inferences, the question should be presented to

a jury. Because, as a matter of law, Cheever's conduct did not wholeheartedly fall outside the scope of her employment, the district court incorrectly granted summary judgment.

### C. This Court Has An Opportunity to Use Noeldner's Claims as a Vehicle to Establish Precedent on Wisconsin Indemnification Standards.

Finally, as Noeldner argued in his principal brief on appeal, this Court has an opportunity to clarify murky precedent related to state law indemnification. Despite the outcome in *Martin*, this Court has yet to settle on a case to <u>indisputably</u> declare whether sexual assaults of this nature should fall within the scope of employment. Noeldner respectfully asks this Court to consider the case before it and determine the status quo for future individuals who find themselves in similar shoes as Noeldner. While difficult, Cheever's conduct is not isolated. Exploiting the Jail's facilities, resources, and inmates for her personal gain could not have occurred without it being directly attenuated to her position and expertise as a state employee.

This Court is not unfamiliar with settling state law indemnification on this matter. In our neighboring jurisdiction, this issue was litigated and resolved. Illinois state and case law carved a path toward answering this question but still heeded this Court's warning that it wished not to resolve the issue of respondeat superior liability and indemnification. *See Doe v. Roe,* No. 12 C 9213, 2013 WL 2421771, at *3–*5 (N.D. Ill. Jun. 3, 2013) (finding that a reasonable person could conclude from the allegations in the complaint that the officer's sexual assault was within the scope of his employment, and thus denying the village's motion to dismiss plaintiff's *respondeat superior* and indemnification claims); *Doe v. Lee,* 943 F.Supp.2d 870, 880 (N.D.Ill.

2013) (denying the village's motion for summary judgment on plaintiff's *respondeat superior* and indemnification claims); *Arias v. Allegretti,* No. 05 C 5940, 2008 WL 191185, at *5–*6 (N.D. Ill. Jan. 22, 2008) (same)). Eventually, this Court determined that such actions fell outside the scope of employment based on the particulars of Illinois' precedent. *See Johnson v. Cook County,* 526 Fed. Appx. 692, 697 (7th Cir. 2013). That was based almost entirely on this Court's understanding of Illinois state law and its purpose. This Court has fleshed out Illinois' indemnification statute and has come to a solid conclusion.

Wisconsin law now stands in the same crossroad yet lacks precedent to achieve similar results. Under Wisconsin law, public employees' intent at the time of the acts in question is a significant factor for a court to consider in deciding whether those acts were "within the scope of employment," so as to render a government entity potentially liable under the indemnification statute. *See* Wis. Stat. Ann. § 895.46(1)(a). *Martin,* 904 F.3d at 553. Yet, the Wisconsin Supreme Court has also instructed that an employees' *intent* when committing the acts in question is instructive. *Olson*, 457 N.W.2d at 483.

For instance, this Court's analysis in *Bell v. City of Milwaukee* mirrored the Wisconsin Supreme Court's interpretation of "scope of employment." 746 F.2d 1205, 1268-69 (7th Cir. 1984), *overruled by Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005). There, the Court scrutinized two police officers' conduct when one of them plunged a knife in the others hand in an effort to cover up the killing of a suspect. *Id.,* at 1215. In affirming the lower court's decision to deny indemnification, this Court agreed that

the officer had dual motives: one while performing his duties as an officer, but another in an improper way to evade punishment. *Id*. Indemnification was therefore inapplicable.

Here, however, Cheever's conduct is rather intertwined such that a jury could reasonably find her conduct within the course of her daily employment duties. The law on this topic is unclear and deserving of a clean, thorough analysis akin to the Eastern District of Wisconsin's decision in *K.R. v. Matthew R. Baumhardt, et al*, No. 21-CV-0118, 2022 WL 16958920 (E.D. Wis. July 14, 2022). *See* App. B. Importantly, underlying all indemnification cases is a strong emphasis on intent and purpose. In adhering to those principles, dividing Cheever's actions in separate pieces makes applying indemnification easier to digest: her conduct leading up to the physical act of sexual assault all fall within the scope of her employment. She used her uniform, control, medication room access, and ability to manipulate positions throughout the jail all while serving her employer's objectives. Cheever could never have committed the physical acts in question without her employer's apparatuses. Only the physical act of violence justifiably falls toward serving her own objectives.

This Court in *Martin* did not feel compelled to decide whether sexual assault categorically is never within the scope of employment. However, after assessing Wisconsin law and Cheever's deliberate actions to manipulate her otherwise authorized duties into her personal desires, indemnification is appropriate and should be applied consistently across to the board to similar conduct. Considering the

facts of the case before it, this Court should hold that a reasonable jury could find Cheever's sexual assault of Noeldner to be within the scope of her employment.

## **CONCLUSION**

Based on the arguments made in his principal brief and herein, Appellant Cole Noeldner requests this Court **REVERSE** and **REMAND** this case for further proceedings.


Dated this 8th day of February, 2023.

**CADE LAW GROUP LLC**

By: *s/Annalisa Pusick*
      Nathaniel Cade, Jr.*
      Wis. Bar No. 1028115
      Annalisa Pusick
      Wis. Bar No. 1116379
      P.O Box 170887
      Milwaukee, WI 53217
      (414) 255-3802 (phone)
      (414) 255-3804 (fax)
      nate@cade-law.com
      annalisa@cade-law.com

      Attorneys for Plaintiff-Appellant

<u>**CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(A)(7),**</u>
<u>**FRAP RULE 32(G), AND FRAP RULE 32(C)**</u>

The undersigned counsel of record for Plaintiff-Appellant furnishes the following in compliance with F.R.A.P Rule 32(a)(7) and Cir. R. 32(c):

I hereby certify that this brief conforms to the type-volume rules contained in F.R.A.P. Rule 32(a)(7) for a brief produced with a proportionally spaced 12-point (or larger) type-face fond. The length of this brief is 6,103 words.

Dated this 8th day of February, 2023.

**CADE LAW GROUP LLC**

By: <u>*s/Annalisa Pusick*</u>
      Nathaniel Cade, Jr.*
      Wis. Bar No. 1028115
      Annalisa Pusick
      Wis. Bar No. 1116379
      P.O Box 170887
      Milwaukee, WI 53217
      (414) 255-3802 (phone)
      (414) 255-3804 (fax)
      nate@cade-law.com
      annalisa@cade-law.com

      Attorneys for Plaintiff-Appellant

## **PROOF OF SERVICE**

Pursuant to F.R.A.P. 25(d), I e-filed a digital copy of the brief in searchable PDF format via the ECF System and served all counsel of record with the digital version via CM/ECF System to the following:

> Samuel C. Hall, Jr
> Sara C. Mills
> Crivello Carlson, S.C.
> 710 Plankinton Avenue, Suite 500
> Milwaukee, Wisconsin 53203
> Phone: (414) 271-7722
> Fax: (414) 271-4438
> shall@crivellocarlson.com
> smills@crivellocarlson.com

Dated this 8th day of February, 2023.

> Respectfully submitted,
>
> **CADE LAW GROUP LLC**
>
> By: *s/Annalisa Pusick*
> Nathaniel Cade, Jr.*
> Wis. Bar No. 1028115
> Annalisa Pusick
> Wis. Bar No. 1116379
> P.O Box 170887
> Milwaukee, WI 53217
> (414) 255-3802 (phone)
> (414) 255-3804 (fax)
> nate@cade-law.com
> annalisa@cade-law.com
>
> Attorneys for Plaintiff-Appellant

✓

# CERTIFICATE OF SERVICE

### Certificate of Service When All Case Participants Are CM/ECF Participants

I hereby certify that on ___February 8, 2023___, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/___Annalisa Pusick___

# CERTIFICATE OF SERVICE

### Certificate of Service When Not All Case Participants Are CM/ECF Participants

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:                          address:

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

s/_____